UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:13-cr-197-J-32JBT

WILLIAM ROLAND BAKER
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress Physical Evidence ("Motion") (Doc. 83) and the Government's Response thereto (Doc. 85). The undersigned held an evidentiary hearing on September 22, 2015. (*See* Transcript ("Tr.") at Doc. 87.) For the reasons set forth herein, the undersigned **RECOMMENDS** that the Motion be **DENIED**.

### I.      Summary of Recommendation

On May 29, 2013, law enforcement officers executed a search warrant at Defendant's residence which authorized the search for and seizure of various items, including documents pertaining, in general, to child pornography. (Tr. 9, 11, 13; Gov. Ex. 2.) Prior to conducting the search, FBI Special Agent ("S.A.") Abbigail Beccaccio was briefed on the scope of the warrant, and on the facts and circumstances underlying Defendant's prior 1995 arrest for lewd and lascivious

---

[1] "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], . . . a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

fondling of a five-year-old child ("the prior arrest" or "Defendant's prior arrest").[2]  (Tr. 9.)  While searching Defendant's residence, S.A. Beccaccio discovered two copies of a writing entitled "Me and Bill" (the "Writing"), with a copyright symbol dated July 4, 1996, which she briefly reviewed before seizing.  (Tr. 14–17.)

In the Motion, Defendant argues that the Writing should be suppressed because its seizure was not authorized by the warrant. (Doc. 83 at 4.)   In its Response, the Government concedes that the warrant did not specifically authorize seizure of the Writing, but argues that its seizure was lawful under the plain view doctrine.  (Doc. 85 at 3–4.)

At the hearing, Defendant argued that the evidence showed that before S.A. Beccaccio began searching the residence, Mr. Baker's wife, Penny Baker ("Mrs. Baker"), specifically informed her that there was a box of materials in the attic relating to the prior arrest.  (*See* Tr. 63–72.)  Defendant argued that the plain view doctrine does not apply because S.A. Beccaccio was searching for evidence relating to the prior arrest, and not for items authorized by the warrant.  (*See* Tr. 63–72.)

The undersigned recommends that the Motion fails both as a matter of law and as a matter of fact.  The Supreme Court has made clear that the plain-view analysis does not depend on the subjective intent of the officer executing the warrant.  *See Horton v. California*, 496 U.S. 128, 138 (1990).  Following *Horton*,

---

[2] Defendant pled guilty to this charge and adjudication was withheld.  (*See* Gov. Ex. 7.)

2

there is no longer a requirement that for the plain view exception to apply, discovery of the item must be inadvertent.  *See id.* at 130.  Thus, even if S.A. Beccaccio was subjectively looking for evidence not encompassed by the warrant, the search and seizure would not be constitutionally impermissible "if the search is confined in area and duration by the terms of [the] warrant . . . ."  *See id.* at 138.  In this case, the search was so confined.

Moreover, to the extent the law allows some room for Defendant's argument, it fails as a matter of fact.  The undersigned recommends that S.A. Beccaccio's testimony that she was searching for documents encompassed in the warrant when she found the Writing was credible.  Moreover, to the extent there was any material conflict between the testimony of S.A. Beccaccio and the testimony of Mrs. Baker, S.A. Beccaccio's testimony was more credible.  Based on the evidence presented, the undersigned recommends that the Court find that S.A. Beccaccio was looking for evidence authorized by the warrant at the time she discovered the Writing, the incriminating character of which was immediately apparent.

## II.   Standard

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).  "The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable

within the meaning of the [F]ourth [A]mendment." *Id.* "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

As explained by the Eleventh Circuit:

> The "plain view" doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent. . . . An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.

*United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) (citations and quotations omitted).

Regarding application of the plain view doctrine to documents, the Eleventh Circuit has stated:

> [A]n officer acting pursuant to such a warrant [authorizing the seizure of documents] is entitled to examine any document he discovers, but that the perusal must cease at the point of which the warrant's inapplicability to each document is clear. . . . [S]ome perusal, generally fairly brief, [is] necessary in order for police to perceive the relevance of the documents to the crime. . . . There is no rule of law which requires an officer to know with absolute certainty that all elements of a putative crime have been completed when he seizes an article which reasonably appears to be incriminating evidence. [The officer's] reasonable conclusion that the documents were

4

> incriminating on their face was sufficient to satisfy the
> ["immediately apparent" prong of the plain view doctrine].

*United States v. Slocum*, 708 F.2d 587, 604–05 (11th Cir. 1983) (citations and quotations omitted).

Additionally, in holding that "even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition," the United States Supreme Court has explained:

> [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.  The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

*Horton*, 496 U.S. at 130–31, 138 (suppression of evidence seized pursuant to the plain view doctrine was not necessary even though a law enforcement officer "testified that while he was searching for [items described in a warrant], he also was interested in finding other evidence connecting petitioner to the robbery").

## III.   Relevant Evidence at Hearing[3]

The Government's only witness was S.A. Beccaccio.  The Government introduced seven exhibits, including the application and affidavit for the search warrant (Gov. Ex. 1), the search warrant and inventory of items seized (Gov. Ex. 2),

---

[3] This section is meant only as a general summary of the evidence.  It does not represent proposed findings of fact.

three photographs of Defendant's bedroom and attic (Gov. Exs. 3, 4, 5), the Writing (Gov. Ex. 6), and documents related to the prior arrest and guilty plea (Gov. Ex. 7). (*See* Doc. 86-1.)  Defendant's only witness was Mrs. Baker, and Defendant did not introduce any exhibits.

### A.    Testimony of S.A. Beccaccio

On direct examination, S.A. Beccaccio testified to the following.  This case was initiated by FBI S.A. Veronica Edwards, who identified Defendant's residence through his IP address after she conducted peer-to-peer downloads of child pornography from a computer with that address.[4]  (Tr. 8–9.)  Before applying for a search warrant, S.A. Edwards conducted a background check on Defendant and discovered the prior arrest.  (Tr. 9.)  S.A. Edwards ordered that arrest report and spoke with S.A. Beccaccio about the prior arrest.  (Tr. 9.)  Law enforcement officers executing the search were briefed the day before the search, and reviewed the search warrant, the application and affidavit for the search warrant, and documents related to the prior arrest.  (Tr. 9.)

On May 29, 2013, the search warrant was executed at Defendant's home.  (Tr. 11.)  S.A. Beccaccio was originally listed as an interviewer on the operational plan, but once the interview of Mrs. Baker was taken care of, she was free to search the residence.  (Tr. 12.)  The following exchange took place regarding the search:

---

[4] S.A. Edwards was present in the courtroom and seated at counsel table, but she did not testify.

Q       So tell us about your search of that particular room.

A       During the search of the bedroom on the top floor, I came across a small alcove closet area, which I began to search.   There were a number of file boxes that contained papers.   And pursuant to the search warrant, I began looking in those boxes.

Q       Were you aware that the search warrant called for or authorized the search and seizure of particular documents?

A       Yes, I was.

(Tr. 13.)

While searching the file boxes, she found two identical sheets of paper which appeared to be a poem entitled "Me and Bill" with a copyright date of July 4, 1996. (Tr. 14–15.)   The following exchange took place at the hearing:

Q       Okay.   And so when you found that particular document, what did you do?

A       We're trained to scan each document for relevancy, and upon scanning it, became immediately apparent that this had evidentiary value.

Q       And why did you believe that it had evidentiary value?

A       Due to the nature of Mr. Baker's prior arrest for lewd and lascivious that occurred in 1995, on a five-year-old child, this poem entitled Me and Bill is also dated 1996 following his arrest.   It's in a childlike tone for the people.

Q       Were you able to make some opinions about what it might refer to?

7

| A | I was.  It goes from a very positive tone in the beginning to kind of a negative tone towards the end of the poem for the child's voice. |
|---|---|
| Q | Okay.   And specifically how did it appear incriminating to you? |
| A | It took two seconds of review for me to decide that it had, you know, intrinsic evidentiary value in terms of relevance based on his prior conviction for the lewd and lascivious and the search that brought us there on child pornography the day of the 29th. |

(Tr. 15–16.)

On cross-examination, S.A. Beccaccio testified to the following.[5]  She was provided a copy of the warrant before executing the search.  (Tr. 19–20.)  The warrant did not explicitly provide authority to search for evidence regarding Defendant's prior arrest, but she had authority to search all documentation on the scene.  (Tr. 21.)  S.A. Beccaccio and FBI S.A. Eileen Jacob conducted the interview with Mrs. Baker outside of the residence prior to S.A. Beccaccio searching the residence.  (Tr. 22–24.)  S.A. Beccaccio could not recall how long or if she stayed during the entire interview.  (Tr. 22.)  Mrs. Baker discussed Defendant's prior arrest, and specifically used the term "secrets," which is one of the reasons the Writing stood out as being relevant.[6]  (Tr. 24.)

Regarding what, if anything, Mrs. Baker told S.A. Beccaccio about materials

---

[5] To the extent evidence elicited during her direct examination is largely repeated, it is not addressed again.

[6] The Writing contains the line: "We have secrets."  (Gov. Ex. 6.)

related to Defendant's prior arrest, the following exchange took place:

Q    And in particular, he – as you mentioned, I guess, something about the secrets, [Mrs. Baker] suggested to you that some of his material about that – related to that conviction was in the house; correct?

A    That is correct.

Q    And she specifically told you that there was a box of material that contained information about the – about the prior lewd conviction?

A    I believe so.  I'd have to refresh and reread [S.A. Jacob's report].

Q    And, in fact, . . . what you did, was she told you it was in the attic in the upstairs bedroom is [sic] the box?

A    I'd have to refresh and review [S.A. Jacob's report].

. . .

Q    The immediate question is there's no reference to Mrs. Baker having made a statement similar to that in Special Agent Jacob's report that you saw?

A    Correct.  And none that I recall.

Q    And my question to you in the first instance is this, is it your recollection that Mrs. Baker made a remark to yourself and Special Agent Jacob that there is a box in the closet that contains the material – the written material related to his 1995 conviction in the closet or in the attic in the upstairs bedroom?

A    None that I recall.

Q    Well, what is your recollection of what she said

about the material related – the location of the
material related to the prior conviction?

A    I don't recall that from the interview with Mrs. Baker,
but there were portions that I stepped away, so
Special Agent Jacob may have only been privy to
that if that was mentioned by Mrs. Baker.

Q    All right. . . . did I understand you to say that you
thought Ms. Baker may have made a remark about
a box of material?

A    No.

. . .

Q    And I'm sorry, I apologize, because I hadn't seen
this. [Mrs.] Baker shared with Agent Jacob that she
kept all the paperwork related to the charge of lewd
and lascivious on the child and offered to get it if the
interviewing agent wanted to see it?

A    Again, I don't recall that specifically, but if it's in
[S.A. Jacob's report].

(Tr. 24–27, 42.)

S.A. Beccaccio testified that upon opening the blue folder in a box containing
the Writing, it was apparent that it was not a visual depiction of child pornography,
a chat log, or a list of addresses relating to child pornography.   (Tr. 30–31.)
However, "it was immediately apparent that it had evidentiary value for an unnatural
interest in children in whatever capacity based on [Defendant's] 1995 arrest or the
child pornography predication that brought us to the residence."   (Tr. 31.)   She
further testified that there was other paperwork in the blue folder concerning
Defendant's prior arrest, but she could not recall exactly what it was.   (Tr. 31,

10

33–34.)  When asked "when you went up there to look in that box, it wasn't based on Ms. Baker having specifically told you that the material related to his 1995 conviction is in a box in the attic in the bedroom," S.A. Beccaccio responded "No, it was not."  (Tr. 34–35.)

The remaining testimony related to whether S.A. Beccaccio recalled a number of specifics in S.A. Jacob's report of the interview of Mrs. Baker.  S.A. Beccaccio recalled a number of statements made by Mrs. Baker reflected in the report.  (*See* Tr. 35–47.)  However, she did not recall several, and only vaguely recalled some. (*See* Tr. 40, 42–47.)  Ultimately, when asked "[a]s I go through this, the one thing that you don't remember hearing is: Hey, there's a box up in the closet in the attic that has all the stuff related to the 1995 conviction; that's your testimony," S.A. Beccaccio answered "[t]hat is my testimony."[7]  (Tr. 48.)

## B.   Testimony of Mrs. Baker

Mrs. Baker testified to the following.  On May 29, 2013, she was interviewed outside of her house by S.A. Beccaccio and another female agent.  (Tr. 49–50.) One was asking questions, and one was writing things down.  (Tr. 50.)  They were mostly asking questions "about my husband's past conviction."  (Tr. 51.)  Regarding

---

[7] Although S.A. Jacob's report was not introduced into evidence, it appears from the aforementioned questioning that the report indicates only that Mrs. Baker "shared with Agent Jacob that she kept all the paperwork related to the charge of lewd and lascivious on the child and offered to get it if the interviewing agent wanted to see it."  (Tr. 42.)  The questioning did not reflect that the report indicated that Mrs. Baker told either agent where the paperwork was located.  (*See* Tr. 42.)

that prior arrest, in response to one agent asking if Mrs. Baker had asked in 1995 to have her daughters interviewed by the Department of Children and Family Services ("DCF"), she responded that DCF, not her, had requested the interview.  (Tr. 51–52.) She told the agents that she had the letter from DCF, as well as "all the records." (Tr. 52.)  She testified multiple times that she told the agents that those records were in a file in a box in the attic.  (Tr. 52–55, 61.)  She asked the agents if they wanted her to get them, and they said no.  (Tr. 53.)  She also testified that she refers to the small room where the Writing was found as the attic.  (Tr. 54.)

It was Mrs. Baker's understanding that Defendant pled no contest to the prior charge.  (Tr. 56.)  However, she conceded that he actually pled guilty after reading a portion of Government's Exhibit 7.  (Tr. 56–57.)  When asked about the agents who interviewed her, she correctly identified S.A. Beccaccio, but misidentified S.A. Edwards, who was seated at counsel table, as the other agent who interviewed her.[8] (Tr. 50, 57–58.)

### IV.    Proposed Findings of Fact and Credibility of Witnesses

As explained further below, the undersigned finds credible the testimony of S.A. Beccaccio.  To the extent her testimony materially conflicts with Mrs. Baker's testimony, the undersigned finds S.A. Beccaccio's testimony more credible. Accordingly, the undersigned recommends the following proposed findings of fact:

---

[8] In rebuttal, S.A. Beccaccio reiterated that it was S.A. Jacob, not S.A. Edwards, who conducted Mrs. Baker's interview with her.  (Tr. 62.)

12

1) S.A. Beccaccio was searching for items encompassed within the warrant when she found the Writing;

2) S.A. Beccaccio was lawfully located in a place from which the Writing could be plainly viewed and had a lawful right of access to the Writing;

3) The incriminating character of the Writing was immediately apparent to S.A. Beccaccio; and

4) It was reasonable for S.A. Beccaccio to readily conclude that the Writing was incriminating on its face.[9]

## V. Analysis

### A. S.A. Beccaccio was lawfully located in a place from which the Writing could be plainly viewed and had a lawful right of access to the Writing.

The warrant authorized S.A. Beccaccio to search Defendant's entire residence, including the closet in which the Writing was found, as well as the boxes therein, for documents related, in general, to child pornography.[10] (*See* Gov. Ex. 2.) Thus, she was lawfully located in a place from which she could plainly view the Writing, and she had a lawful right of access to it. Moreover, she had a lawful right to peruse the document to determine if it was within the scope of the warrant.[11] (Tr.

---

[9] To the extent that any of the proposed findings of fact represent mixed questions of law and fact or conclusions of law, the undersigned recommends them as such.

[10] S.A. Beccaccio referred to the room at issue, photographed in Government's Exhibit 5, as a closet or an alcove, while Mrs. Baker referred to that room as an attic. (Tr. 13–14, 54.) The terms are used interchangeably herein.

[11] Defendant does not argue otherwise, and in fact appears to concede that, to the extent S.A. Beccaccio was searching for evidence of child pornography, she was lawfully in place. (Tr. 64, 67.)

13

15–16.)  *See Slocum*, 708 F.2d at 604–05.

### B.   The incriminating character of the Writing was immediately apparent to S.A. Beccaccio.

S.A. Beccaccio testified that prior to searching Defendant's residence, she was aware of Defendant's "prior arrest for a lewd and lascivious fondling of a five-year-old child."  (Tr. 9, 11.)  She also testified credibly that upon scanning the Writing, its incriminating character was immediately apparent to her based on Defendant's prior arrest, the age of that victim, the title and date of the Writing, its childlike tone, the use of the term "secrets," and the child pornography allegations underlying the warrant.  (Tr. 15–16, 24.)  S.A. Beccaccio testified that "it was immediately apparent that [the Writing] had evidentiary value for an unnatural interest in children in whatever capacity based on [Defendant's] 1995 arrest or the child pornography predication that brought us to the residence."  (Tr. 31.)  The undersigned finds this testimony credible.

Further, a "reasonable conclusion that the [document was] incriminating on [its] face" was required.  *See Slocum*, 708 F.2d at 605.  Based on the contents of the Writing, the undersigned recommends that it was reasonable for S.A. Beccaccio to readily conclude that the Writing was incriminating on its face.

### C.   Defendant's Argument

Defendant argues essentially that the plain view doctrine does not apply because S.A. Beccaccio was not searching for evidence of child pornography

14

pursuant to the warrant when she found the Writing, but was searching for evidence relating to Defendant's prior arrest.  (Tr. 66–68.)  This evidence was outside the scope of the warrant.  (Tr. 66–68.)  The undersigned recommends that this argument, and any related arguments, fail both as a matter of law and as a matter of fact.

### 1.    Defendant's argument fails as a matter of law.

The Supreme Court has made clear that the plain-view analysis in this context does not depend on the subjective intent of the officer executing the warrant.  *See Horton*, 496 U.S. at 138 ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.  The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.").  Following *Horton*, there is no longer a requirement that for the plain view exception to apply, discovery of the item must be inadvertent.  *See id.* at 130 ("[E]ven though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition.").[12]  Thus, even if S.A. Beccaccio was subjectively looking for evidence not encompassed by the warrant, the search and seizure would still be constitutionally

---

[12] Prior to *Horton*, the Eleventh Circuit recognized an additional prong to the plain view doctrine requiring that "the searching agents must inadvertently discover the disputed evidence."  *See Slocum*, 708 F.2d at 604.

permissible "if the search is confined in area and duration by the terms of [the] warrant . . . ." *See id.* at 131, 138 (suppression of evidence seized pursuant to the plain view doctrine was not necessary even though a law enforcement officer "testified that while he was searching for [items described in a warrant], he also was interested in finding other evidence connecting petitioner to the robbery").   As explained above, these requirements were met in this case.[13]

The cases cited by Defendant at the hearing are distinguishable and/or do not support his position.  In *Arizona v. Hicks*, the Supreme Court explained that "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry."  480 U.S. 321, 325 (1987).  Thus, the Supreme Court stated that the "moving of the [stereo] equipment . . . did constitute a 'search' separate and apart from the search for the shooter, victim, and weapons that was the lawful objective of [the officer's] entry into the apartment."  *Id.* at 324–25.

Here, there was no separate new search.  S.A. Beccaccio did not take any actions unrelated to the execution of the warrant.  She was lawfully searching for documents encompassed by the warrant when she found the Writing.  Her perusal of the Writing did not constitute a new search because the warrant authorized the search of all documents in the residence for evidence related to child pornography,

---

[13] Defendant does not argue that the duration of the search was excessive.

and the brief perusal of all documents to determine whether they were encompassed within the warrant was lawful.  (Gov. Ex. 2.)  *See Slocum*, 708 F.2d at 604–05. Therefore, *Hicks* is readily distinguishable.

Additionally, Defendant relies on the general language in *United States v. Menon*, a Third Circuit decision, that "even though an officer can keep his or her eye out for particular objects while conducting a lawful search, the Court has made quite clear that the 'plain view' doctrine cannot be used to expand the scope of a legal search—there must be 'scrupulous adherence' to the requirement that the search be limited to the time and place necessary to find the items listed on the warrant." 24 F.3d 550, 560 (3d Cir. 1994).  However, as explained above, the search in the instant case was consistent with this requirement.  In fact, *Menon* actually supports the recommended result.[14]  In *Menon*, the Third Circuit stated:

> We first note that the deliberate decision by the agents to search for [documents not encompassed by the warrant] does not in and of itself make the seizure of such documents illegal.  The Supreme Court has specifically rejected the requirement . . . that the discovery of the evidence be inadvertent . . . .
>
> [A] subjective inquiry into [the officer's] state of mind is unnecessary.  Given the fact that a subjective inquiry would almost certainly yield the same result as an objective inquiry and that evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer, we hold that a

---

[14] The undersigned recognizes that *Menon* is not binding authority, but may be persuasive.

17

> government agent has discovered evidence within the
> scope of the search allowed by the warrant if the agent's
> search fits within the literal terms of the warrant and is a
> reasonable means of obtaining the objects described in
> the warrant.

*Id.* at 559–60 (quotations and citations omitted).   This language describes the

situation herein.

Further, the *Menon* court held:

> In sum, because 1) the Jabeco documents came into plain
> view in the course of Almeida's search of the desk; 2)
> Almeida's search of the desk was reasonable under the
> terms of the warrant which entitled her to search that desk
> until she found all of the blank Abad invoices that the desk
> contained; and 3) in glancing at these documents long
> enough to determine that they were not blank Abad
> invoices, it was immediately apparent, using the collective
> knowledge of the officers on the premises, that the
> documents were evidence of criminal activity, we hold that
> the search and seizure of these documents did not violate
> the Fourth Amendment.

*Id.* at 563.

Here, as in *Menon*, the Writing came into plain view in the course of S.A.

Beccaccio's search of the file boxes in the closet in the upstairs bedroom; her search

of those boxes was reasonable under the terms of the warrant, which entitled her to

search Defendant's entire residence for documents pertaining to child pornography;

and in glancing at the Writing long enough to determine whether it was

encompassed by the warrant, the incriminating character of the Writing became

immediately apparent to her.  Therefore, the subject search was consistent with the

holding in *Menon*.   For all of the aforementioned reasons, the undersigned recommends that Defendant's argument regarding the subjective intent of S.A. Beccaccio fails as a matter of law.

### 2.   Defendant's argument fails as a matter of fact.

To the extent the law allows some room for Defendant's argument, it fails as a matter of fact.   S.A. Beccaccio testified credibly that she was searching for evidence of child pornography pursuant to the warrant when she found the Writing. (Tr. 13–14.)   Moreover, she specifically testified that she was not searching the boxes in the closet because Mrs. Baker told her that one of those boxes contained materials related to Defendant's prior arrest.   (Tr. 34–35.)   In fact, S.A. Beccaccio repeatedly testified that she did not recall Mrs. Baker telling the agents that there was a box of materials relating to Defendant's prior arrest in the attic.   (Tr. 26–27, 42, 47–48.)   She also testified that she may have stepped away during the interview or not been present the entire time.   (Tr. 22, 26–27, 44.)

Moreover, while not in evidence, S.A. Jacob's report appears to corroborate, at least in part, S.A. Beccaccio's testimony.   Although S.A. Beccaccio was questioned extensively regarding S.A. Jacob's report, it does not appear from that questioning that the report indicates that Mrs. Baker provided the location of the materials related to Defendant's prior arrest to the agents.   Rather, at most, it appears that S.A. Jacob's report indicates that Mrs. Baker shared with S.A. Jacob that she kept all the paperwork related to the prior arrest and offered to get it if the

19

agents wanted to see it.  (Tr. 42.)  Without knowing the specific location of this paperwork, S.A. Beccaccio would have no reason to search any particular box for it.

Although Mrs. Baker testified that she informed the two agents interviewing her that there was a box of materials relating to Defendant's prior arrest in the attic (Tr. 52–54), the undersigned finds more credible S.A. Beccaccio's testimony that she did not recall any such statement or may not have been present for it.  (Tr. 22, 26–27, 42, 44, 47–48.)  Mrs. Baker did not appear to have a good grasp of details.  As examples, Mrs. Baker misidentified one of the agents who conducted the interview (Tr. 57–58, 62), and testified that her husband had not pled guilty in connection with his prior arrest when in fact he had (Tr. 56–57).  Moreover, Mrs. Baker clearly has a substantial interest in the outcome of this proceeding, which further diminishes her credibility.  Also, given the circumstance of multiple FBI agents showing up unannounced at her home to conduct a search, which Mrs. Baker testified "scared" her, the undersigned does not find credible her uncorroborated testimony that she specifically remembers that she told the agents the location of the prior arrest paperwork.  (Tr. 52–54, 59.)  Furthermore, even if such a statement was made, the undersigned still finds credible S.A. Beccaccio's testimony that she either was not present for it or does not remember it, and that it was not the reason she was searching the attic.  Thus, to the extent their testimony materially conflicts, the undersigned finds that S.A. Beccaccio was a more credible witness than Mrs. Baker.

## VI.    Conclusion

The undersigned recommends that S.A. Beccaccio's seizure of the Writing was lawful under the plain view exception to the warrant requirement. Therefore, the undersigned recommends that the Motion be denied.

Accordingly, it is respectfully **RECOMMENDED** that:

The Motion (**Doc. 83**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on October 15, 2015.

_____

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

Counsel of Record